## Earle Estate

Before Sinkler, P. J., Klein, Bolger, Hunter and Lefever, JJ.

434

440

442

*C. Brewster Rhoads*, guardian ad litem, for Anthony Wayne Earle (minor), exceptant.

*Joseph W. Swain, Jr.*, and *Montgomery, McCracken, Walker & Rhoads*, for guardian ad litem.

*Frank Rogers Donahue*, guardian and trustee ad litem for minor and unborn contingent remaindermen of residuary trust.

*John B. Gest, Esq.*, for *Frank Rogers Donahue*, guardian and trustee, ad litem for minor and unborn contingent remandermen of residuary trust.

KLEIN, J., June 15, 1951.—This case furnishes additional evidence that the administration of the law is,

at best, an imperfect science. We have before us for interpretation the will of George H. Earle, Jr., himself a noted lawyer and brilliant financier, who in the exercise of his wisdom and judgment, accumulated a large fortune. The will was witnessed, and apparently prepared, by H. Edgar Barnes, testator's friend and attorney, who was also a renowned lawyer and served with distinction as a justice of the Supreme Court of this State. We should certainly expect to find this instrument free of all ambiguity and clearly expressive of testator's intent. Yet the simple event of the birth of a grandson confronts us with an extremely puzzling question of construction.

If we could acquit our responsibility in this case with regard for considerations of sentiment alone, we should certainly accept the contention of the able guardian ad litem appointed by the court to represent the interests of this infant grandson and sustain his exceptions to the adjudication. A purely objective study of the will from its four corners, however, convinces the majority of this court that the auditing judge has correctly decided the issue adversely to the claim of the grandson. In our opinion, there is no need to dwell upon the so-called "rule of convenience"; we base our decision upon the intention of testator as appears from the language in his will.

We agree with the learned auditing judge that this case falls within the general rule of law holding that in any immediate gift to a class, the class closes as of the date of testator's death and we find nothing in the provisions of this will that denies the application of the rule.

Careful examination of item 5 of the will fortifies us in this conclusion. This item is restricted to gifts to certain of testator's children and is divided into three separate paragraphs. Each of these paragraphs begins

with the following language, which is repeated three times without change:

"In the event that my estate, after the payment of taxes, shall at least amount to the net sum of five million ($5,000,000) dollars or over . . ."

Since the same language is repeated as a preface to each of the three paragraphs comprising item 5, we must assume that testator intended it to have exactly the same meaning each time it was used: Blackburne's Estate, 290 Pa. 55 (1927); Klapp's Estate, 19 Pa. Superior Ct. 150 (1902); 3 Jarman on Wills, p. 2146, Rule XVIII (7th ed.). Let us therefore look more closely at the substance of this item in its entirety.

The first paragraph provides for an increase from $100,000 to $300,000 in the trust for a granddaughter, Louise Dilworth Beggs, if the expressed condition is met; the second, an increase in the trust for a second granddaughter, Edith Earle Lee, from $200,000 to $500,000 upon the same condition. The third paragraph of this item, which contains the gift in question, provides for the creation of trusts in the sum of $100,000 for "each and every male child of my sons who shall by birth inherit and bear the name of Earle".

In our opinion the time at which it was necessary to determine whether the net estate, after payment of taxes, "shall at least amount to the net sum of five million ($5,000,000) dollars or over" was at the audit of the executors' account. It was at that time that the extent of the estate's liability for taxes and the amount of the claims of creditors were established with certainty. It was then that the "net" value ("sum") of the estate was ascertained. Any other construction might give rise to speculation whether the *continuance* of all of the trusts created under item 5 does not depend upon the maintenance of a minimum net value of $5,000,000 *at all times*. This might necessitate frequent

reappraisements of the entire estate and, possibly, changes in the structure of the trusts. It might also produce an anomalous situation which would necessitate the creation of trusts for some of the after-born grandsons and not for others, depending on the value of the estate at the time each of such grandchildren was born. Such a result would be highly impractical and was obviously not contemplated by testator.

There is nothing in this will to suggest that testator intended the creation or continuance of these trusts to depend on future fluctuations in the value of the assets comprising the residuary estate. It seems clear to us that when, at the time of the audit of the executors' account in 1929, it was established that the net value of the estate was $5,000,000 or more, it became mandatory for Judge Henderson, the auditing judge, to direct the trustees to set up the trusts for the two granddaughters, as provided in item 5 of the will. This he did. Any subsequent diminution in the value of the residuary trust could not affect the continuance of these trusts in any manner. Conversely, if the net estate at the time of the audit of the executors' account had not amounted to $5,000,000, the additional trusts for the two granddaughters would have fallen and no subsequent increase in value could have revived them. The adjudication of Judge Henderson directing the creation of these trusts at the time of the audit of the executors' account was final and conclusive, and the judgment became res judicata.

In our opinion, testator intended that all of the trusts created under item 5 were to be set up at one and the same time. Since the trusts for the two granddaughters had to be set up at the time of the audit of the executors' account, it follows that the trusts for the grandsons bearing the family name "Earle" also had to be created at that time, or not at all. This is in accord with the established rule of law with respect to

gifts to a class and also in harmony with the entire testamentary plan.

It is significant to note that testator in the ninth paragraph of his will stated:

"Upon the death of any of my children above named, *either before my death or thereafter. . . .*" (Italics supplied.)

The use of this clause clearly demonstrates that testator recognized the import of such language. If he had said in item 5 of his will "for the benefit of each and every male child of my sons who shall by birth *either before my death or thereafter* inherit and bear the name of Earle", there would have been no doubt that he intended to include afterborn grandsons. However, his failure to include this clause in item 5 and his inclusion thereof in item 9 indicates that he did not intend that interpretation or effect to be given to subparagraph 3, item 5.

The argument that testator had pride in his family name and desired especially to favor descendants who bore that name, to the exclusion of any other class of beneficiary, does not bear the light of analysis. At the time of the execution of the will testator had 14 grandchildren: Eight granddaughters, and six grandsons (excluding Ralph Earle, 2nd, who was en ventre sa mere). Of these 14 grandchildren, testator selected two granddaughters, neither of whom bore his name, for special consideration; one to the extent of $500,000 and the other to the extent of $300,000. The gifts to the grandsons "who shall by birth inherit and bear the name of Earle" were only $100,000 to each. In preferring these grandchildren it seems more likely that testator was influenced by the apparent needs of the children, rather than pride in his family name.

In conclusion, we wish to emphasize what the learned auditing judge had made clear in his adjudication. Our conclusion does not disinherit Anthony Wayne

Earle or his issue. We merely hold that he is not entitled to the preference which is being sought in his behalf. The interest which he and his issue have in the residuary estate is not affected by our decision.

The exceptions are therefore dismissed and the adjudication confirmed absolutely.

## DISSENTING OPINION

BOLGER, J., June 15, 1951.—The majority opinion and the adjudication are falsely premised. None of the authorities cited support any principle of construction which would close the class at the date of testator's death or at the audit of the executors' account. The only principle of law which could possibly accomplish this purpose is the rule of convenience upon which the majority opinion does not rely and which, as hereinafter stated, I understand the adjudication holds inapplicable. Actually the apposite Pennsylvania and other authorities all support the inclusion of exceptant's ward in the class.

The correct premise is that every effort should be made to include the grandson claimant in the class. The writer of the majority opinion was the auditing judge in Hogg's Estate, 28 D. & C. 215, where, in allowing the claims of afterborn grandchildren in construing gifts to "grandchildren" in testator's will written in 1865, he stated, p. 219:

"We cannot, by artificial rules of construction, attribute a meaning to a word which will disinherit some grandchildren in favor of others, where, as here, all come within the ordinary meaning of the term.

"The gift in remainder to my 'grandchildren their heirs and asigns forever per stirpes' is clearly a gift to a class, which vested in all members of that class born during the continuance of the primary estates, and which remained open for the inclusion of all grand-

children born prior to the termination of the last of the primary estates: Edwards' Estate, 255 Pa. 358; Minnig v. Batdorff et al., 5 Pa. 503."

Exceptions to this adjudication were dismissed and the Supreme Court affirmed in 329 Pa. 163. Rosengarten Estate, 349 Pa. 32, holds: "It requires plain and unambiguous words to exclude any number of a class." In Whitman v. Webner, 351 Pa. 503, it was stated:

"It is well settled that if a person qualifies within the exact meaning of language describing a class he will be held to be a member of that class unless other language in the instrument expressly or by clear implication indicates a contrary intent. . . ."

Broad interpretations favoring lineal descendants such as exceptant's ward are illustrated in Clark Estate, 359 Pa. 411, and Disston Estate, 349 Pa. 129, where gifts to grandchildren were held to include great-grandchildren.

In contrast to the elements of the will relied upon by my brother judges, I find many considerations more cogent and convincing in support of this claim, with or without the benefit of the presumption enunciated above.

The language of the gift in the instant case ". . . for the benefit of each and every male child of my sons who shall by birth inherit and bear the name of Earle . . ." definitely qualifies exceptant's ward as a member of the class. I can find nothing in the will nor in the majority opinion or the adjudication which either expressly or by necessary implication requires the exclusion of this grandson of testator from the class.

The language of this gift is clear and unambiguous. Therefore, no rules of construction need be invoked. Certain things are implicit in the donative language. The keynote of the gift, which is expressly rejected by the majority, is testator's desire to perpetuate his name.

Therein lies our main conflict of opinion. This purpose is effectuated by special gifts in trust to natural sons of his sons. "Each and every" means without limit which is obviously essential to perpetuation. "Shall inherit and bear the name of Earle" clearly connotes afterborn grandsons. Had testator meant otherwise, he would have deleted the word "shall" or he would have mentioned his grandsons by name. Ambiguity is not implicit in this gift. It is only when resort is had to extraneous considerations drawn from other provisions of the will that any possible ambiguity is created.

The clarity of the claimed gift is more clearly demonstrated when we put outselves in testator's armchair: Schmick Estate, 349 Pa. 65. When he wrote his will and when he died, testator was 71 years of age. As a successful lawyer and financier he had achieved outstanding distinction in his community. We must assume he knew the extent of his estate, which after settlement netted more than $10,000,000. He was survived by his widow, 2 sons, 3 daughters, 14 grandchildren, including three grandsons bearing the name of Earle and a fourth en ventre sa mere, all sons of George, and two great-grandchildren, a third being en ventre sa mere. The will provides life estates for his widow and children, with income per stirpes to their issue until the trust terminates. For Louise Dilworth Beggs and for Edith Earle Lee, daughters of deceased daughters, he provided trusts irrespective of the size of his estate of $100,000 and $200,000 respectively. In item 5 these trusts were to be increased to $300,000 and $500,000 respectively, should his net estate exceed $5,000,000, with gifts of income over to issue, these trusts to terminate at the time of the termination of the residuary estate. Then appears the paragraph containing the disputed gift. To cover these trusts in item 5, testator must have known he was establishing a fund of at least $5,000,000, more than

sufficient to provide life estates for his widow and children. The main element of the testamentary scheme is the duration of all trusts, viz., 21 years after the death of the last surviving grandchild or great-grandchild living at testator's death when principal is distributable per capita to testator's issue then living.

The language of the instant gift comprehends the future tense. Testator was proud of his name. Just as he provided income for his motherless granddaughters, he created preferences for all sons of his sons bearing the name of Earle. The importance of his intent to perpetuate his name cannot validly be minimized. It is perfectly legal, natural and commendable. Therefore, every effort should be exerted to effectuate it and not to thwart it. Testator's immediate family included only two sons who could fulfill his purpose. At the time of the execution of his will, these sons were not too old to beget other sons after his death, nor their wives too old to bear them. In fact, George's wife was pregnant at the time. Again, why did testator include sons of Ralph when he knew Ralph had none, unless he intended to include sons of Ralph born after his death? These sons were also of such ages that they might not be expected to beget so many sons after testator's death that gifts to them would be a real burden upon the residue. Events support this conclusion. To exclude Anthony Wayne Earle, a son of George by his second wife, would be attributing to testator the intention of excluding also afterborn sons by the then wives of George and of Ralph. We do not believe he so intended. The gift offers to Ralph and to George supplementary funds to raise such sons and thus encourage them to beget them. Obviously, neither Ralph nor George could know of this benefit until the publication of testator's will after his death. The majority opinion rejects this conclusion by linking these gifts with the Beggs and Lee gifts, with the observation that they were all

prompted by "the apparent needs of the children rather than pride in his family name". This observation ignores two controlling facts. in addition to the obvious one that the Beggs and Lee grandchildren were not sons of sons bearing the name of Earle. The Beggs and Lee gifts are to orphan granddaughters. They were no doubt in need because they had no mothers to whom testator could bequeath anything, and, therefore, they were given special bequests, whereas, *all other grandchildren*, including the sons of sons bearing the name of Earle, had parents living all of whom benefited through their parents or by way of substitution. However, nowhere does it appear that the sons of sons thus preferred were in need. The fact that testator gave them each $100,000 trusts and made no provision for the other children of his children, being eight in number, demonstrates that his sole motive for their gifts was to perpetuate his name. Any other conclusion is unnatural and strained. It does real violence to this important part of the testamentary scheme.

Closing the class at the date of the death of testator fails to give effect to all of testator's language. Words of futurity must be given effect. In Mogg v. Mogg, 1 Mer. 654, 35 Eng. Rep. 811 (1811), there was a trust for the support and maintenance of the children begotten and to be begotten of his daughter, Sarah. It was held that five children born after the date of death of testator took along with those born prior thereto. Although the gift there was of an aggregate sum to a class, such gift does not differ from gifts of separate sums to members of a class *when they will not delay the administration of the estate* and, therefore, Mogg v. Mogg (supra) applies. The auditing judge rejected the authority of this case stating, "Words importing futurity, such as 'born and to be born', are satisfied by giving the bequest to those born between the making of the will and testator's death". This statement is

inexact and the supporting authorities cited by the learned auditing judge are inapposite, because they are based upon the rule of convenience, which the auditing judge himself rejected. We have here the two elements of presence of futurity and absence of inconvenience. The only authority cited by the auditing judge which does not expressly rely upon the rule of convenience is Seligman v. Seligman et al., 151 N. Y. S. 889, not an appellate court decision and not binding.

Another accepted exception to the general rule that the class closes at testator's death is when there are no members of the class in existence at the time of the execution of the will or at the date of testator's death. The theory is that the gift to sons of Ralph would otherwise be a nullity which testator did not intend. Ralph had no sons when testator died. Should the exception apply, it would logically follow that if the principle applies to after-born sons of Ralph such sons of George must also be included, they all being members of the same class. There is sound authority in support of this proposition. In 1 Hunter's Pennsylvania Orphans' Court Commonplace Book, p. 388, entitled "Estates", section 9(c), under the heading "Devise to Unborn Person", it is stated: "To the children of A, a living person, who has no children, is an executory devise to children when born." He cites, inter alia, Mitchell v. Long, 80 Pa. 516, and Leisenring's Estate, 237 Pa. 60. In the former case, testator devised land to his third son, John, "to him, his wife and children, during their natural lives . . ." John, who was unmarried at the execution of the will and the death of testator, afterwards married and died leaving a wife and children. It was held that the gift was an executory devise on the contingency which must happen if at all during John's life and, therefore, not too remote. It vested in the wife on her marriage and the children on their birth. In Leisenring's Estate, supra, testatrix pro-

vided a gift of the balance of income to be divided between the children of M, if any, and upon her death, the principal to be divided between the children of M then living, with remainder over if she left no children. When the will became operative, M was unmarried, but later married and had a son. It was held that M's child took all income which accrued prior to his birth as well as thereafter; that the gift of surplus income was immediate, not being built upon the determination of any prior estate, but given direct to the beneficiaries who are made primary legatees; and the fact that testatrix knew of the nonexistence of such beneficiaries when she wrote her will is immaterial. The court said:

". . . it is well settled that where there is an immediate gift to children, and there is no object in esse at the death of the testator, the gift will embrace all the children who may subsequently come into existence, by way of executory bequests: 2 Jarman on Wills 721; Hawkins on Wills 70; Williams on Executors 1175. . . . In Harris v. Lloyd, Turner & Russell, Ch. Rep. 310, a leading authority on the subject, the legacy was in trust for the children of A. A had no children at the death of the testator. It was held by Lord Eldon that afterborn children would take, and that the interest until the birth of a child fell into the residue."

Text authority supports this decision. In 3 Jarman on Wills, 7th ed., 1663, it is said:

". . . it is well settled that if there is no object in esse at the death of the testator, the gift will embrace all the children who may subsequently come into existence, by way of executory gift." The foregoing Jarman citation cites Weld v. Bradbury, 2 Vern. 705, and Shepherd v. Ingram, Amb. 448. In the latter case the gift was to such child or children as A shall have taking upon them the name of S. This language was held to embrace all after-born children, there being no child of A alive

at testator's death. See also Schouler on Wills, 6th ed., §1017.

The rejection of this contention in the adjudication because the instant gifts are separate sums to each member of the class and the effect would be to postpone distribution is erroneous because as we have seen hereinbefore, distribution is not postponed—as the adjudication states, "The class could remain open until the final termination of the residuary trust without inconvenience to the estate." Furthermore, the authorities cited are inapplicable: Rogers v. Mutch follows Ringrose v. Bramham and was decided entirely upon the rule of convenience. Similarly, the citation of A. L. I. Restatement of the Law of Property, §294, clause B, 2ii, comment (o), is based upon the rule of convenience involving the delay in distribution of the entire balance of the assets.

It is not clear whether the majority opinion accepts or rejects the rule of convenience cited in the adjudication. However, it is quite clear that the rule should not be applied. As stated in 3 Jarman on Wills, 7th ed., 1640, the rule is artificial and usually defeats the intention of testator; therefore, the tendency of the courts is not to apply it unless it is necessary. That eminent authority also refers on p. 1658 to Lord Loughborough's statement that though the rule is of extremely convenient construction, it is convenient only to parties who profit by it; not to the children who are excluded. Text authorities support the case law. 2 Simes, §386, where the language of the will is such that distribution of the entire estate would be postponed until a time subsequent to the testator's death even though a fixed sum to each member of the class be given, citing McLain v. Howald, 120 Mich. 274, where gifts of $100 each to the daughters of Mary Anne with a life estate to the widow, with distribution at her death, held that the class was kept open until the death of the

widow. "It (the rule) does not therefore apply in cases where the period of distribution is postponed. . . ."

It is further contended that it would be an inconvenience to the trustees in setting aside securities for such a trust, to equalize as well as could be the benefits for the four other sons of George H. Earle, 3rd, which were set up immediately after the adjudication of the executors' account and which have depreciated in value. This and the other cited inconveniences involved in the operation of the trust by the trustees are inherent in this type of trust and, therefore, must have been anticipated by testator. Practical administrative problems are minor and do not partake of the essential inconvenience referred to in the rule, viz., *postponement of distribution of the residue or the principal part of the estate*, resulting in the defeat of testator's main intent to immediately benefit the chief objects of his bounty.

Reference in the adjudication to the rule of convenience ending the ability of the class to increase in membership beyond the death of testator enunciated in A. L. I. Restatement of the Law of Property, §294(*q*), and other authorities is incomplete. The last paragraph of comment (*q*) deals with exceptions to the general rule, which we hold are applicable here, and reads as follows:

"When, however, the circumstances show that the inconvenience in permitting the class to remain open past the effective date of the conveyance containing the limitation is slight, these circumstances can justify the finding of the 'contrary intent of the conveyor', and can thereby prevent the rule stated in this Section from applying. Such circumstances sometimes consist in the relative smallness of the stated sum given to each member of the class, and sometimes consist in the establishment by the will of a separate special fund out of which all the stated sums must be paid. These circumstances have significance because they make it pos-

sible to distribute most of the assets of the decedent, even though this class is permitted to increase in membership, and hence tend to justify the conclusion that the testator wished persons born into the described group after his death to become recipients of his bounty."

Applying these exceptions to the facts of this case, we find that: (1) The administration of this estate cannot be said to be more than slightly inconvenienced by the segregation of such sums of $100,000 from the residue, which presently amounts to more than $6,800,-000 (excluding $1,200,000 set up following the adjudication of the executors' account in trust for the grandsons living at testator's death and the Beggs and Lee trusts). As pointed out by the auditing judge, the net personal estate accounted for by the executors exceeded $9,000,000 plus real estate, according to a subsequent accounting of the trustees, amounting to nearly $1,300,000 net. The amount of this gift and of possible other like gifts is, therefore, relatively small considering the size of testator's net estate; (2) I regard that part of the estate in excess of the net sum of $5,000,000 referred to in item 5 of the will as tantamount to the "establishment by the testator of a separate special fund out of which all of the stated sums must be paid".

In enunciating the rules of law pertaining to class gifts, the learned auditing judge points out that a gift of an aggregate sum to a class is to be distinguished from gifts of separate sums to each member of a class, in that the former delay distribution among the class, but not of the estate, whereas the latter delay distribution of the estate itself. Since this distinction rests entirely upon the element of convenience, it follows that the gift in issue rests to all intents and purposes upon the same basis as a gift of an aggregate sum to a class. It also renders inapplicable the line of cases cited in the adjudication, and in the brief for the repre-

sentative of the residuary beneficiaries, starting with Ringrose v. Bramham, 2 Cox 384, which the learned auditing judge describes as containing the origin of the rule of convenience.

The argument that to keep the class open until the date of death of testator's sons would unduly deplete the residuary estate is not supported by the facts, most of which have already been recited. The sum to be applied primarily to the fulfillment of testator's main testamentary scheme is $5,000,000, less gifts of $100,-000 and $200,000 to his motherless granddaughters. This conclusion derives from the minimum amount fixed in item 5 upon which the gift in question is contingent. This leaves more than $5,000,000 as a fund for the trusts in this item. Obviously, the total of such actual or potential trusts could not conceivably constitute a burden upon the residue.

The learned auditing judge sustained the contention of the representative of the residuary beneficiaries, that a trust for an after-born grandson is inconsistent with the general plan of the will, because his life estate may continue beyond the closing date of the residuary trust. It is pointed out that claimant-minor is 20 years and 10 months younger than his youngest half-brother. This conclusion is incorrectly premised.

For a proper understanding of this as well as of the other points subsequently discussed, we must first ascertain the duration of these trusts. The gifts to grandsons in item 5 are not for any definite duration, being merely in trust. The Beggs and Lee trusts, upon which they are modeled, are for the respective lives of the beneficiaries, with income to their issue at their respective deaths before the termination of the trusts, until the termination of all the trusts as fixed in item 11. At that time, principal is distributable to the granddaughter's issue. It is to be noted that *there is no express provision made to cover the event of these grand-*

*daughters surviving termination of their respective trusts.* In item 9 testator gives his son, Ralph, who had adopted Edith Earle Lee, a testamentary power of appointment to her and her issue of income at Ralph's death, and *at the termination of the trust to appoint to her and to her issue such share of the residuary estate* as she would receive if she had been the natural child of Ralph. This power of appointment is further recognized in the residuary clause of item 11, wherein Edith Earle Lee is excluded expressly from sharing in the residue, unless Ralph appoints to her. It is clear, therefore, that Edith Earle Lee's life was not regarded by testator as a measuring life for the duration of the trusts. In item 11, Louise Dilworth Beggs and her issue are also expressly excluded from sharing in the residue. It must be concluded, therefore, that testator intended Louise Dilworth Beggs' life also not to be a measuring life for the duration of the trust, evidently because she as well as Edith Earle Lee might outlive all other grandchildren and great-grandchildren alive at testator's death. It is clear, therefore, that if the Beggs and Lee trusts are consistent with the testamentary scheme and no one has raised any question as to them, it is equally clear that a trust for claimant would be just as consistent because it is patterned upon them. *The foregoing analysis of the will reveals that every problem inherent not only in this but also in the subsequent phases of the discussion of the validity of a gift to claimant is implicit in the Lee and Beggs gifts because the former derives from the latter.*

After pointing out that the Beggs and Lee trusts as well as trusts for living grandchildren are consistent with the testamentary scheme of testator and do not violate the rule against perpetuities because the will must be construed in such a way, if possible, as to prevent the necessity for applying the rule, the learned auditing judge expresses considerable doubt as to the

duration and destination of trusts for after-born grandchildren, if any. What will happen should Anthony Wayne Earle survive the termination of the trusts? The learned auditing judge states that principal cannot be paid to him because he was given but a life estate, his issue would not qualify and we could not accelerate their interests because they must be "him surviving". Furthermore, acceleration would destroy the alternative gift to the residuary legatees if the grandson died without such issue.

The patterning of the gifts to grandsons upon the Lee and Beggs trusts does not involve the question of whether an after-born grandchild shall take, *but only as to how and to what extent he shall take:* Bowen's Estate, 139 Pa. Superior Ct. 523. Having already decided that after-born grandsons are entitled, the determination of the duration of a trust to claimant is unimportant and should normally await further accounting based upon future events. Presumed uncertainties at the termination of the residuary trust will not be permitted to tear down a well defined testamentary scheme: Rosengarten's Estate, 349 Pa. 32. However, since the auditing judge partly bases his interpretation of testator's intent as to the substantive question upon this ground, we shall examine it with the reservation that what is here stated shall have no binding effect at the audit of subsequent accounts.

It is important to note that as above stated this problem is also inherent in the Beggs and Lee trusts and nobody has raised any question as to their duration. Actually, testator's intention as to the duration of such trusts is not to be gathered from any one or two paragraphs of the will, but must be ascertained from an examination of the entire instrument: Shaw's Estate, 342 Pa. 182; Packer's Estate (No. 1), 246 Pa. 97. The gifts to grandsons in item 5 are merely in trust, not for any fixed period. Later in the same item,

such trusts are patterned upon the same terms, conditions and uses as the Beggs and Lee trusts in items 3 and 4. These latter gifts are for life. However, as set forth above, the Lee and Beggs trusts are to terminate under item 11 at the same time as the residuary trust (excepting possibly as to the survival of Louise Dilworth Beggs and Edith Earle Lee beyond that time). Thus we observe an ambiguity exists as to just what estates an after-born grandchild, *as well as Louise Dilworth Beggs and Edith Earle Lee, take,* should they all survive the termination of the residuary trust. This ambiguity does not involve irreconcilably conflicting provisions of the will and resort is, therefore, not to be had to the rule of construction that of two inconsistent provisions, the latter should prevail. Every intendment must be to sustain the gifts if possible since the provisions in question can be reconciled. The problem is simple. If an after-born grandson's gift be declared a life estate, his interest will conflict with the period fixed for termination and, therefore, the termination provision would not be given effect; also, it might result in a finding that the remainders following the life estate all fall under the rule against perpetuities. As pointed out by the learned auditing judge, such a conclusion will be avoided because it is possible to do so: Shaw's Estate, supra. On the other hand, if the provision with respect to termination be relied upon solely, the interest would be per autre vie, which would not be consistent with items 3, 4 and 5, where life estates are provided. It is our opinion that just as in Packer's Estate (No. 1), supra, where it was held that the dominant purposes of testator were to keep the trust alive for the accomplishment of the purposes fixed in the will, the provisions of item 11 are dominant. These items are readily reconciled by reading the limitation in favor of an after-born grandson as "income for life or until the date fixed by Item Eleventh for termination

whichever shall sooner occur". This result does no violence to the will, is consistent with its terms and gives effect to all its provisions, whereas any other construction does untold violence to the testamentary scheme, to the gifts to Louise Dilworth Beggs, to Edith Earle Lee as well as to after-born grandchildren.

What happens then to the gift to issue should Anthony Wayne Earle survive the termination of the trust or to the alternative gift of the residue if he survive the trust and die without issue? I repeat, the same as happens to the Beggs and Lee gifts about which the learned auditing judge experienced no difficulty. In construing the gift as an income interest for life or until the termination of the trust, we find two conditions annexed to the gift with no gift over upon the happening of one of them. This creates a situation analagous to that in Fletcher v. Hoblitzell, 209 Pa. 337, where testatrix provided an estate for her husband for life or until remarriage with remainder over upon the husband's death. There was no remainder over upon remarriage. However, the court held that a gift over upon remarriage should be implied and that the remainders were accelerated to the date of remarriage. Also see Estate of W. J. H. Bruch, 185 Pa. 194. The income from $5,000 was bequeathed to Elizabeth Hamlin as long as she remained single bearing the name of Elizabeth Hamlin and after her death to a cemetery fund. Elizabeth Hamlin married after the death of testator and the question arose as to what disposition should be made of the fund because there was no remainder over upon her remarriage. It was held that a gift over upon marriage would be implied and that the remainder was accelerated to the date of marriage.

In most jurisdictions, a contingent remainder may be accelerated in a proper case: 164 A. L. R. 1444. See also Coover's Appeal, 74 Pa. 143; I Hunter's Pennsylvania Orphans' Court Commonplace Book, Election by

Spouse, sec. 15 (*a*). Therefore, if the termination date fixed in the residuary clause arrives during the lifetime of an after-born grandson, the remainders will be accelerated to the date of termination and the remaindermen will be ascertained at that time. If an after-born grandson has issue living at the date of termination, such issue take.

. What happens to the alternative gift to the residuary legatees if an after-born grandson die without issue? In Pennsylvania and elsewhere, the existence of alternative gifts does not prevent acceleration and when acceleration occurs, the interests of alternative remaindermen are eliminated: Disston's Estate, 257 Pa. 537; Kern's Estate, 296 Pa. 348 and 164 A. L. R. 1297.

It is argued by the representative of the residuary estate that should claimant prevail now, he will receive a potential preference over his half brothers, since he may also be a residuary beneficiary, whereas they cannot be. Claimant's life is not one of the measuring lives of the residuary trust and he will take a share of the residue if he survives, whereas his half brothers' lives are such measuring lives and they, therefore, cannot benefit. No real weight is given to this point. Claimant is not that much younger than the three great-grandchildren or of the 14 grandchildren, one of whom was en ventre sa mere at testator's death, or his youngest half brother, who was in a like state at that time, that he may be reasonably expected *to outlive all of them by twenty-one years*. The merit of this argument is actually all on claimant's side, because if he does not survive the termination of the trust, which is not only not a potentiality but an improbability, and he be denied his present claim, he will not benefit at all under testator's will. We do not believe that testator intended the possibility that an after-born grandson bearing the name of Earle should be totally excluded from the benefits of his will. This is

especially true when we consider that all of the principal remainders are to be distributed per capita to those who would be so remote from testator as great-grandchildren and great-great-grandchildren. Should claimant survive the trust, the extent of his potential preference will be very slight because his half brothers will benefit under the residuary clause through their children who will individually receive shares as large as claimant should he survive the trust. We also point to other inequalities in the will existing in the exclusion of both Louise Dilworth Beggs and Edith Earle Lee and their issue from participating in the distribution of the residuary trust, unless Ralph appoints a share thereof to Edith Earle Lee. Finally, we believe that the principle of Rosengarten Estate, 349 Pa. 32, should be applied here, that a well-defined testatmentary scheme should not be torn down by a supposed contrary intention, which is merely inferred from what is presumed would have been testator's intention had he been acquainted with the same composition at the time of the distribution of the corpus.

The majority opinion seizes upon the language appearing as a condition for all of the gifts in item 5 of the will, "In the event that my estate, after the payment of taxes, shall at least amount to the net sum of Five Million ($5,000,000) Dollars", to support its conclusion that testator intended the class to close as of the date of the audit of the executors' account. The theory is that that was the only time for the determination of whether or not the net estate after taxes would amount to a net sum of $5,000,000 and from that implication we are to draw the further implication that testator intended that all trusts created in item 5 must be then set up, excluding the possibility of any other trusts being set up thereafter as a charge against the residuary trust. These successive implications are not logical and are not fairly drawn. To now conclude

that testator went through this subtle ratiocination when he created these trusts is highly imaginary. The only express condition is the net sum of $5,000,000, which has been fulfilled. The element of time is not mentioned in the will, but is merely implied by the majority. Actually that time is academic as to this claim because the net estate has at all times far exceeded the minimum. Whatever effect it may have on other future claims is not now before us.

Obviously, the date of the confirmation of the executors' account was when the net estate should be determined for the purpose of setting up the Beggs and Lee trusts and for the four sons of George, but it does not necessarily follow that testator intended that all trusts under the will had to be then set up. Obviously, no contingent or executory trust could then be set up. This was expressly recognized in the adjudication of the executors' account by Judge Henderson, who stated in part:

"Whether grandsons hereafter to be born will also be included within the provisions of Item Fifth of the will need not be determined at this time, but the award of residue to the trustees is made without prejudice to their rights if any."

To hold that that adjudication rendered this problem res adjudicata is palpably erroneous.

The majority's conclusion obviously stems from its rejection of testator's desire to perpetuate his name. It does not constitute that clear implication which the authorities require in order to exclude exceptant's ward from the class of grandchildren comprehended in the gifts. On the other hand, if we accept testator's intention to be the perpetuation of his name, it follows clearly that future trusts which could not be set up at the time of his death, were intended by him to be a charge upon the residuary trust. It is a fair and rea-

sonable conclusion that since testator did not fix the time at which the net sum of $5,000,000 should be determined, that as to after-born grandsons that time should be when the interests vested, i.e., when such after-born grandchild or grandchildren were born. In City Bank, etc., v. Bruguiere, 128 N. J. Eq. 120 (1940) testator provided a gift of $50,000 to a stepson following a life estate to his widow. In a codicil, testator increased this gift to $100,000 should his net estate exceed $1,000,000, without fixing any time. It was held that since the gift was not to take effect until the widow's death, the value was to be determined at that time. This construction effectuates Mr. Earle's intent and avoids the rigidity of the majority opinion which would result in including in the class of grandsons those born after testator's death but before the confirmation of the executors' account, but exclude those born after the latter event, even any that might be born of George's then wife, a great favorite of testator's. Thus we see that the main error in the majority opinion is in excluding after-born grandsons not because of the express condition of the net estate exceeding $5,000,000, but because of the element of time which is not expressed in the will.

The majority opinion when it points to the inconvenience involved in using any other time for determining the net amount of $5,000,000 than the confirmation of the executors' account, invokes the rule of convenience when it points out that any other construction would require constant reappraisements throughout the operation of the residuary trust. As hereinbefore stated, such inconvenience is only an incidental consideration since it does not delay the distribution of the bulk of the residuary estate and would have to be assumed only when future grandsons are born and their interests vest in conformity with the intent of testator.

The use by testator of the phrase, "Upon the death of any of my children above named, either before my death or thereafter . . ." cannot fairly be used as the basis for the conclusion that such language evidences testator's knowledge of how to provide for the occurrence of events after his death as well as before and that since he did not use this language in item 5, he did not intend to include after-born grandsons. Testator's reference in item 9 is to the death of his children, whereas in item 5 the reference is to birth of grandsons. Had he used the phrase, "before or after my death" in item 5, he would have created a redundancy because he had already said, "each and every male child of my sons who shall by birth inherit and bear the name of Earle", which language, as pointed out, is all-inclusive. Furthermore, in item 9 testator was dealing with a gift to individuals and not to a class because he there states, ". . . death of any of my children above named . . . " and he is referring to item 8 of the will in which his children are specifically named and in which life estates are given to them in the share of income which had previously been paid to his wife. When we look at other parts of the will, we find other situations wherein testator did not use the phrase "either before my death or thereafter", where it would have been equally appropriate with its use in item 9. In the second paragraph of item 9, he provides for the eventuality of the ". . . death of any of my children without leaving issue him or her surviving . . ." It is obvious that testator there referred to the death of any of his children either before or after his death, but he does not say so. It is necessary to imply the phrase. He did not employ it in the fourth, fifth or sixth paragraphs of item 9, where its use must be supplied by construction. Finally, he did not use it in item 8, directing the disposition of income upon the death of his wife. Therefore, testator's failure to use this phrase

in item 5 does not have any bearing upon whether the class of grandsons was to close at the date of testator's death.

The exceptions should be sustained.